JANVIER, Judge.
The defendant corporation owns and operates a ferry system by means of which passengers, automobiles and other vehicles and property are transported across the Mississippi River, at New Orleans, between the foot of. Canal Street on the East bank of the river and the foot of Morgan Street on the Algiers or West bank of the river.
Shortly after seven o’clock on the night of January 22nd, 1952, the building known as the “Ferry House” or passenger waiting room and portions of the vehicle ramps leading to and from the ferry landing on the Algiers side of the river were destroyed by fire of unknown origin, and sometime after the fire the bodies of two persons, who had apparently lost their lives in the fire, were discovered in the debris which remained.
Mrs. Tillie Mitchell Schmitt, whose husband Alphonse Schmitt, was last seen entering the building a few moments before the start of the fire, alleging that one of the bodies which was found was that of her husband, and that her said husband was killed in the fire, and that the said fire resulted from negligence on the part of the defendant corporation, or from faulty construction of the building, or from lack of proper fire safe guards, brought this suit against the said corporation, Algiers Public Service Company, Inc., praying for judgment for $20,000, with interest and costs.
*756 Plaintiff charged that the ferry landing was constructed of wood and that the ramps by which automobiles drove to and from the ferry were of wooden planks laid crosswise with cracks between them which permitted cigarette butts, lighted matches or inflammable objects to fall through the cracks and to ignite debris which might be on the batture below; that the ramps were not equipped with sprinkler systems beneath them; that the building was not equipped with proper fire extinguishers or fire hoses; that homeless persons, including criminals and alcoholics, were permitted to seek refuge or shelter beneath said ramps; that the ferry house had only one entrance which made it very difficult for passengers to find their way out in emergencies; that the building itself was not equipped with an automatic sprinkler system, and that there were no fire escapes by which passengers could quickly leave the -building in case of fire.'
Defendant corporation denied all of the charges of negligence. In the Civil District Court for the Parish of Orleans, there was-judgment dismissing plaintiff’s suit and she has -appealed.
When the transcript was lodged in, this. Court counsel for defendant, by motion, called our attention to "the fact that in the transcript there -were quite a number of documents which had -been either not offered in the Court below, or which had been excluded when offered in evidence, and counsel called upon plaintiff to show cause why these documents should not be stricken from the record.
Counsel1 for plaintiff, in answer to this rule, conceded that" all but one of -the said documents should be stricken from the record and not considered by us. But he maintained that one of the documents was properly in the record and should be considered. This document was- a copy of a report made by a deputy Fire Marshal. The objection to this document was based on the fact that the -statements made therein did not result from knowle’dge on the’ part' of the deputy Fire Marshal, but' resulted solely from statements made by other persons, and that therefore the document constituted hearsay,, and- on the further ground that the deputy Fire Marshal did not have jurisdiction over the structure involved and on the additional ground that the said report was not certified or authenticated in any way.
Counsel for defendant also argues that since the document -was excluded in the- Court below there had been no opportunity to cross-examine the deputy Fire Marshal concerning the statements made in the report- The document inferred to is typewi'itten, is not signed by anyone and is not certified by anyone as a true c-o-py of the original. We think that this document was properly excluded. See Johnson v. Sundbery, La.App., 150 So. 299; Coleman v. Universal Life Insurance Co., La.App., 157 So. 411; LSA-R.S. 13:3711.
When we come to consider the controversy on its merits, we find that plaintiff contends that for either or both of two reasons the burden of proving itself free of fault :is on the defendant and that that burden has not been successfully borne:
In the first place, counsel contends that the doctrine 'of'res ipsa loquitur is applicable, that an application of this doctrine places upon defendant the burden of explaining the occurrence or at least of showing itself free of negligence, and, in the second- place, counsel for plaintiff contends that the relationship of carrier and passenger existed between plaintiff’s husband and the defendant ■ and that, consequently, as the result of that relationship, defendant, if it would escape liability, was under the necessity of showing that, on its part, there was' no fault-which had causal connection with'the unfortunate result.
Counsel for defendant contend that the relationship of passenger and carrier had not commenced; -that the doctrine, of res ipsa loquitur had no application, and- furthermore' thát, even if there is placed upon the defendant, the- obligation of proving it-, self - free-of negligence,: no such duty came into existence .until the plaintiff had first *757 shown that her husband lost his life in the fire; that one of the bodies which was found after the fire was actually, that of her husband.
This last contention of defendant is obviously sound. Before .it can be called upon to defend itself against liability for the death of plaintiffs husband, it must appear that plaintiff's husband is dead and that'his death resulted. from the fire. .
We think that, under ;the facts which appear in the record, it is fairly well established that the body which was found in the debris four days after the occurrence was. the body of plaintiff’s husband.
The record shows that for a very long time it hád been his custom to cross the river on one of the defendant’s fe.rrie's at about that time each evening, and it further shows that on that evening only a few minutes before the commencement of the fire, he had been transported to the ferry house in a taxicab driven by a friend and neighbor, and that, after he alighted from the taxicab, he was seen on his way apparently into the ferry house and that he has not been seen since.
It- also appears that, -although no one could positively identify one of the bodies which was found as that of plaintiff’s husband, near it were found certain objects which he customarily wore and which, according to the record, in-all probability he was wearing when he left his home that evening. The obj ects which were identified as having -belongéd to plaintiff’s husband were a hearing aid battery case, the metal frame of a pocketbook, a ring, and a silver religious medal.
It is true that an employee of defendant, a ticket collector who knew plaintiff’s husband by sight but did not know his name, says that she did not see him bn that evening, but she frankly admits that he might: have passed without her noticing him.
Counsel for defendant strenuously argue that the relationship of carrier and passenger is -not shown to have come into existence because of the fact that there is nothing-in the-record which indicates that plain-, tiff’s' husband had purchased a ticket which would have entitled him to board one of the ferries and to cross the river.
We think that the actual, purchase of a ticket was not necessary to the establishment of the relationship of passenger and carrier. Surely when a prospective passenger enters the premises of a carrier at the customary place and in the customary way, and within a reasonable time of the expected departure of the vehicle on which .the passenger is to be transported, the relationship exists even though the passenger, because of some accident which intervenes, may be prevented from purchasing his ticket,
, We do not wish to be understood as holding that merely because the reta-, tionship of passenger and carrier exists the carrier is always under the duty of going forward with the evidence to show itself, free from negligence. It is true that since the decision of our Supreme Court in Cusimano v. New Orleans Public Service, 170 La. 95, 127 So. 376, it has been established that a carrier, in order to free itself from liability to a passenger, must show that it was without fault which caused or contributed to the accident. But that rule is applicable only where, under the facts, it is obvious that the passenger himself did not have, and could not have had, better information than the employees, of the carrier as to. the cause of the accident. When a passenger is in -the conveyance and there occurs therein something of which the passenger has full knowledge but • of which the employees of the carrier obvi-, ously have no knowledge, surely-the rule has no application. Ensminger v. New Orleans Public Service, Inc., La.App. 65 So.2d 402.
We think, however, that in such a case as this,-where the passenger has lost his life and-obviously cannot produce proof as to the causé of the occurrence, the duty is placed on the carrier to show that it was free of any negligence which had- causal connection with the unfortunate result. -It *758 need not show the actual cause hut it must show that, whatever the cause, it was not negligence on its part. Thus we feel that here the burden of exculpating itself was, because of the particular facts, upon the defendant.
Among the numerous charges hurled against defendant are some which are so obviously without merit that we shall discuss only those for which there is found any possible basis.
It is charged that the ramps by means of which vehicles passed to and from the boats were improperly constructed in that they were of wooden boards laid crosswise, and that these boards were placed so that between each two there was an opening through which lighted matches or cigarette butts, if thrown from cars, might fall to the batture below and there ignite such inflammable matter as might be on the bat-ture. It is shown that these ramps had been in use for more than twenty-five years, and that the entire ferry house and rámps had been designed by a most reputable firm of architects and had been constructed by one of the leading general contractors in this locality, and that they had been approved by the City Engineer of the City of New Orleans. It is further shown that it would have been impracticable to have made the flooring of these ramps of metal, because when the river is at a very low stage, the slope-of the ramps would have been so great that there would not have been sufficient traction for many of the vehicles which used them.
As a corollary to the charge that it was negligence to allow these cracks or openings in the floor of the ramps, it was further charged that the defendant permitted the accumulation of large quantities of debris on the batture beneath the ramps. There was no evidence which tended to show that, at the time of the fir.e, there was any such accumulation of debris, and the defendant showed that it was its policy 'to require that any such debris should be removed daily. Defendant’s superintendent testified that he personally checked this every day and the porter whose duty it was to remove such debris said that he did so .daily.
The charges upon which plaintiff principally relies are: (1) That the defendant did not maintain a sprinkler system in the building, and (2) that no fire escapes had been constructed for the purpose of permitting passengers to escape in such emergencies.
One of the inspectors for the Fire Prevention Bureau of New Orleans stated that he had inspected the building sometime prior to the fire, and that he had sent a note to defendant’s superintendent suggesting the installation of an automatic sprinkler system. It was shown, however» that he had not made the suggestion to the superintendent of defendant, but had made it to the superintendent of the Fire Prevention Bureau, and he himself showed that in all probability the superintendent, of the Fire Prevention Bureau had not approved his recommendation since he had not required that such a sprinkler system be installed. It appears that at no time did the said Bureau or anyone else suggest to. the defendant or require that such a sprink-' ler system be installed.
The record is replete with evidence as to the adequacy of the fire protection in and around the. building, and it is shown that frequent tests were made to make certain that such equipment was maintained in good condition and in working order-
The inspector of the Fire Prevention. Bureau, referring to Mr. Ford, the superintendent of the Bureau, stated:
“ * . * * If he figures that a stand pipe and fire hose situation is adequate it would not be mandatory that he should order a sprinkler system. * * *
Counsel for plaintiff argues that in such a building fire escapes are required by law» and he calls attention to Act 171 of 1914» particularly to that portion of section 1 which reads as follows:
“ * * * That every building in ,the State of Louisiana, having more *759 than two stories, and buildings having one or more galleries above the first or ground floor, such as is customary in theatres, now used or hereafter to be used, in whole or in part, as a public building, office building, public or private institution, sanatorium, surgical institute, hospital, asylum, schoolhouse, academy, dormitory, college, theatre, public hall, lodge hall, or place of public resort; and every building in which persons are usually employed above the second story, in a factory, workshop, department store, or mercantile establishment ; every hotel, restaurant, apartment house, flat, boarding house or lodging house, in which persons reside above the second story, shall have one or more fire-escapes on the outside of the said buildings, as may be direct-ted by the State Labor Commissioner except in such cases as he may deem such fire-escapes to be unnecessary, in consequence of adequate provisions having been already made for safety in event of fire or panic; and in such cases of exemption, the said State Labor Commissioner shall give the owner, lessee, or occupant of said building a certificate to that effect, and his reason therefor. * * * ”
That statute was expressly repealed by the adoption of the LSA-Revised Statutes of 1950, but it was in force at the time of the construction of the ferry house and ramps with which we are now concerned. We think that the building in question does not come within the category of those contemplated by that statute.
Counsel for plaintiff insists that there were three stories to this building. We do not think so. The main floor of-the building was constructed at ground level. Passengers entered from the street and passed out through the rear doors to the passenger ramps which lead to the boats. It is true that this ground floor, except where it constituted a continuation of the street in front, was about fifteen feet above the batture of the river and that there was a second floor above it which was used for offices of the defendant company.
It is true also that by LSA-Revised Statutes of 1950, Title 40, section 1663, the Fire Marshal seems to be given authority to require fire escapes, exit doors, etc., wherever he deems them necessary, but the record shows that no such fire escapes were required by the Fire Marshal. We do not think that the LSA-Revised Statutes which are now in force, nor Act 171 of 1914, which was in force when this building and ramps were constructed, made it necessary that fire escapes be constructed from the building.
If there had been fire escapes leading from the sides of the building to the bat-ture below, at certain seasons of the year they would not have been useable because the river stage would have been so high that the batture would have been covered with water, and even at other seasons of the year, when the batture was not covered with water, such fire escapes would not have afforded a. safe means of egress in emergencies since they would have led not to the street but to the sand batture outside the levee.
Counsel for plaintiff argues that the ferry house in question was not safe in that there were not sufficient exits, ■ and that such exits as there were were not separated by sufficient distances from one another. - The record shows that at the front of the building towards the street there were two large exits separated from each other as far as was possible, each being adjacent to the side wall, one on the up river end and the other on the down river end. And the record shows also that there were two similar exits on the rear end of the building leading to the passenger ramps by means of which passengers walked from the ferry house to the boats. As a matter of fact, the inspector of the Fire Prevention Bureau concluded his testimony as to the exits by saying that he had made no recommendation as to any change in the exits, adding: “I evidently thought the place was safe as far as ingress and egress is concerned.”
Surely plaintiff’s husband was fully familiar with the building and with the location of the exits. He had been a night watchman in New Orleans for about forty *760 years, and. for many years had taken the same ferry from the same ferry house and at about the same time.
Counsel; for plaintiff devoted considerable time to a discussion of what he 'referred to as a “pot-bellied” stove in what seems to be a machine shop of the company, which was located across one of the ramps from the building itself and he argued that it was very 'dangerous to have this stove particularly since ashes were taken out of it and placed in' a wooden box.
We have no doubt that this was a very dangerous practice, but the record shows that the fire did not start in that machine shop and that, as a matter of fact, that is the only part of the entire structure which was not in any way damaged by the fire.
To sum up the entire matter we find that the only actual fault found by the inspector of the Fire Prevention Bureau was that no sprinkler system had been installed and, as he himself said, it seems obvious that his recommendation in this regard was disapproved by his superintendent.
While, in such situation, a carrier is bound to show itself free from negligence, it is not the insurer of the safety of its passengers, or of those who intend to become ' passengers,. and where it appears that it conducts its business and constructs its buildings and equipment and operates them in such manner as is customarily and ordinarily considered safe, there is no liability for such unfortunate results as occurred here.
In Johnson v. Bisso Ferry Co., Inc., 13 La.App. 159, 127 So. 661, 662, we discussed the obligation of such a ferry company towards its passengers and the standards which should be adopted in the construction and maintenance of its equipment. What we said there we now repeat:
“For many years this ferry corporation' had operated innumerable boats similar in all respects to the one involved here, and the record shows that no similar accident had occurred. This fact and the further proof that nearly all ferries used for like purposes are similarly constructed is rather convincing evidence of the fact that defendant corporation furnished as safe a place for plaintiff as1 is customarily furnished by prudent carriers engaged in like enterprises, This ds all they were required to do. They are not insurers of the safety of their passengers. Corpus Juris, ‘Carriers,’ vol. 10, p. 863, § 1302; Miles v. New Orleans Public Service, Inc., 3 La.App. 496; Cusimano v. New Orleans Public Service, Inc., 170 La. 95, 127 So. 376. They are liable only if they fail to exercise the highest degree of care usually exercised by prudent perspns engaged in the same or similar enterprises.
“In the planning and construction of their ferryboats they may adopt methods which have been in general use and have been found to be safe and efficient.”
Of course, it cannot be denied that if there had been a sprinkler system, and if there had been fire escapes from the-sides of the building to the batture, and if there had been additional exits leading b> such fire escapes, it is possible that there would have been no loss of life resulting from the fire, but to hold that had they been present possibly plaintiff’s husband might not have lost his life, does not mean that we should also hold that there is liability in the defendant company. To so decide would be tantamount to holding them liable as insurers.
Our conclusion is that there was no fault on the part of defendant, and accordingly, the judgment appealed from is affirmed at the cost of appellant.
Affirmed.
REGAN, J., absent, takes.no part.